UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EASTERN TRANS-WASTE OF MARYLAND, INC., ) ) ) Plaintiff, ) ) v. ) ) THE DISTRICT OF COLUMBIA, et al., ) ) Defendant. ) _____ ) | Civil Action No. 05-CV-0032 (PLF) |

# MEMORANDUM OPINION

Plaintiff Eastern Trans-Waste of Maryland, Inc. ("Eastern") moves for partial summary judgment on its procedural due process claim against defendant District of Columbia ("the District"). Defendants the District and Denzil Noble (collectively, "defendants") cross-move for summary judgment as to the entire Second Amended Complaint—that is, as to both Eastern's substantive (Count One) and procedural (Count Two) due process claims.[1]

Eastern is the operator of a solid-waste transfer station in the District of Columbia. It is required to obtain from the District a building permit to make physical improvements to its station. When Eastern applied for such a permit in 2003, defendant Noble was the Acting Zoning Administrator and/or the Administrator of the Building and Land Regulation Administration of the D.C. Department of Consumer and Regulatory Affairs ("DCRA"), an agency through which the District issues building permits.

---

[1] In a prior decision, the court issued an opinion and order that dealt with several other of plaintiff's claims, while reserving decision on the substantive and procedural due process counts until after discovery. *See* Mem. Op., at 11 (Jan. 23, 2006) [dkt #22]. In deciding those remaining claims today, the court assumes familiarity with its prior decision.

Eastern alleges that defendants violated the Constitution by delaying the issuance of the permit. Its Second Amended Complaint bases relief principally on the ground that the District deliberately and improperly delayed granting its permit application for the purpose of putting Eastern out of business and shifting profits from private solid-waste transfer stations (like Eastern's) to District-owned stations. *See* Second Am. Compl. ¶ 2; Pl.'s Opp'n to Defs.' Mot. for Summ. J., at 29 (Oct. 11, 2006). The Complaint seeks, among other things, compensatory and punitive damages.

The court will deny Eastern's motion for partial summary judgment and grant defendants' motion for full summary judgment, for the reasons that follow.

## BACKGROUND

From 1992 to April 3, 2006, Eastern operated a solid waste transfer station at 1315 First Street, SE, in the District of Columbia. In June 2001, the D.C. Zoning Commission began the process of rezoning Eastern's property from an industrial area to a residential/commercial area. The District permitted Eastern to continue its solid waste operations as a nonconforming use, provided that it did not expand its facility. However, in September 2004 the District selected the area in which Eastern's facility was situated as the site for the future Nationals' baseball stadium, pursuant to which Eastern's property was taken by eminent domain, and the facility's operations ceased, on April 3, 2006. *See* Second Am. Compl. ¶¶ 9, 12-16.

On October 10, 2003 (prior to the stadium site selection), Eastern had applied to DCRA for a building permit to make certain improvements to its facility, estimated to cost $400,000. Initially, the permit was set for approval by DCRA. However, Noble, who was then the Administrator of DCRA's Building and Land Regulation Administration, requested that Eastern

submit an Environmental Impact Statement (EIS), citing a D.C. Code provision that required an EIS for any "substantial modification" to an existing solid waste facility. *See* Pl.'s Mot. for Summ. J., Ex. 8; D.C. Code § 8-109.11. Disputing the characterization of its improvements as a substantial modification, Eastern nonetheless attempted to comply with the request by filing with DCRA an Environmental Impact Screening Form (EISF) instead of the more laborious EIS. DCRA forwarded the EISF to the appropriate municipal agencies, including the D.C. Office of Planning. *See* Second Am. Compl. ¶¶ 17, 22-25.

In May 2004, a staff member in the Office of Planning wrote an internal memorandum to DCRA expressing concerns about Eastern's application and EISF. She wrote that Eastern's proposed construction would impermissibly and negatively impact the surrounding area. Her analysis asserted that "[a]fter completion of the renovation project, approximately 10 new employees with between three to five additional vehicles will be added to the site. The proposed project will substantially alter the facility." However, it is undisputed that no new employees or vehicles would be permanently involved. *See id.* ¶ 32; Pl.'s Mot. for Summ. J., Ex. 14.

Moreover, a staff member to the director of the District-owned solid waste facilities also objected to summarily issuing the permit. He stated that in his past experience with Eastern, it had misrepresented a major alteration to its facility as a minor one. He recommended a careful review and referral of the permit to the Zoning Commission. *See* Second Am. Compl. ¶ 34; Pl.'s Mot. for Summ. J., Ex. 17.

Eastern learned of the error in the May 2004 memorandum and attempted to correct DCRA of this erroneous impression. Without acknowledging the error, DCRA viewed the proposed improvements as an "enlargement" of the facility, requiring a variance from BZA. *See*

Second Am. Compl. ¶¶ 41-43.

In December 2004, Eastern appealed DCRA's decision to the BZA. It sought reversal of DCRA's determination that the grant of Eastern's construction permit required a variance and/or an order directing DCRA to grant the permit. In March 2005, at a hearing before the BZA, DCRA claimed that it objected to the building permit because it constituted a significant "structural alteration" to the facility, not because it was an "enlargement" or "expansion." On May 10, 2005, the BZA rejected this argument and reversed DCRA's decision to deny the permit. *See id.* ¶¶ 44-46.

Meanwhile, on January 10, 2005, in the midst of its appeal to the BZA, Eastern filed the original complaint in this court against the District and various officials, including Noble. On February 15, 2005, defendants filed a motion to dismiss and/or for summary judgment. On January 23, 2006, this court dismissed several of the claims and parties and deferred ruling on the rest of the claims until after discovery. *See* Mem. Op., at 11 (Jan. 23, 2006) [dkt #22]. The court's decision left Eastern to pursue the following claims into discovery:

> - *Count One*: A substantive due process claim against the District and Noble[2] for compensatory damages (*e.g.*, lost profits) resulting from the delay in issuing the permit.
>
> - *Count Two*: A procedural due process claim against the District alone.

*See id.*

During this same period, the District sued Eastern in D.C. Superior Court to condemn Eastern's property through eminent domain for the new baseball stadium. In April 2006, the

---

[2] A third defendant, Andrew Altman, was subsequently dismissed from the action. *See* Stipulation of Dismissal (July 18, 2006) [dkt #37].

property was taken pursuant to the eminent domain proceedings. Nevertheless, Eastern alleges that the District's delay in issuing the permit cost it profits it might have earned prior to the facility's condemnation. *See* Second Am. Compl. ¶¶ 16, 47.

## DISCUSSION

I.     **Legal Standard**

Summary judgment is proper if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Paraskevaides v. Four Seasons Washington*, 292 F.3d 886, 893 (D.C. Cir. 2002).

II.    **Plaintiff's Motion for Summary Judgment on the Procedural Due Process Claim (Count Two)**

In Count Two of its Second Amended Complain, Eastern alleges the District violated its right to procedural due process. Despite the fact that Eastern *eventually obtained the building permit*, Eastern argues that the federal Constitution requires a pre-deprivation evidentiary hearing—over and above the BZA appeal it was already afforded—to avoid *delays* of the sort Eastern suffered in issuing building permits.

As DCRA's process currently stands, an entity seeking a permit from DCRA may be denied without a pre-deprivation hearing. When the denial is based upon a zoning regulation, it may be appealed to the BZA. BZA may then, if it believes an error was made, reverse the decision of the DCRA. *See* D.C. Code § 6-641.07; D.C. Mun. Regs. tit. 11, § 3100.2. Persons dissatisfied with the BZA's decision may appeal to the D.C. Court of Appeals. D.C. Code § 2-510(a). The question is whether this procedure satisfies constitutional due process

requirements

The Constitution's requirements for procedural due process "impose[] constraints on governmental decisions which deprive individuals of [certain] liberty or property interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (quotation marks omitted). Determination of the process that the government must provide before depriving a person (or entity, *see, e.g.*, *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001)) of a property interest generally requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335; *see Tri County Indus. v. District of Columbia*, 104 F.3d 455, 460-62 (D.C. Cir. 1997). In the seminal *Mathews* case, the Supreme Court considered whether procedural due process required the Social Security Administration to provide a pre-deprivation evidentiary hearing before revoking disability benefits. After noting that the Social Security Administration provided a number of procedures other than an evidentiary hearing, the Court decided that such process was not necessary. Likewise, I conclude that the Constitution does not require a pre-deprivation hearing before DCRA denies a building permit.

The facts of this case are similar to, and hence likely controlled by, *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068 (D.C. Cir. 2003). In *3883 Connecticut*, a developer had obtained permits to begin construction work on an apartment building. The District, however, issued a Stop Work Order to the developer in the midst of the initial stages of

construction. The District did not provide a pre-deprivation hearing before issuing the Order.

The court of appeals held that the District had satisfied the Constitution for purposes of procedural due process. *See id.* at 1074. Although no pre-deprivation hearing was available, the court noted that under provisions of the Construction Codes, the developer "was entitled to an expeditious appeal process with three levels of review." *Id.* at 1073. These rights to appeal afforded the process necessary under *Mathews*. *Id.* at 1074. The developer argued an erroneous Stop Work Order would create a substantial risk of construction delays, at great financial cost to him, and claimed an adversarial hearing was required to reduce those risks. The court rejected the argument and said that the multiple levels of review were sufficient for constitutional due process. *Id.*

Likewise, Eastern argues the risk of an erroneous delay of a building permit, costing Eastern millions of dollars, is high absent a pre-deprivation hearing prior to referral of the matter to the BZA. There is little difference between this scenario and that in *3883 Connecticut*: In both cases, the procedure provides a right to appeal any potentially erroneous denial of a permit, without providing for a pre-deprivation hearing of the denial. Such a procedure, in this circuit, is constitutional. *Id.* (citing *Cokinos v. District of Columbia*, 728 F.2d 502, 503 (D.C. Cir. 1983)).

Eastern attempts to distinguish *3883 Connecticut* on the ground that the levels of review permitted in that case were expedited. The argument is unpersuasive. It is true that *some* of the Stop Work Order appeals process required expeditious review (*e.g.*, for the initial review, the reviewing official had three working days to render a decision, *see id.* at 1073-74). However, the last level of administrative review (to the District's Board of Appeals and Review) did not require expeditious review under the municipal regulation. A dissatisfied challenger of such an

Order thus would *not* be entitled to expeditious review upon appeal to the final administrative authority. And nowhere did the court of appeals in *3883 Connecticut* base its decision or reasoning upon the expeditiousness of the review process. In any event, the need for expedited process is far greater where, as in *3883 Connecticut*, the District immediately and unexpectedly halts the activities of a permit *holder* already in the middle of a construction project. By contrast, an *applicant* for a permit like Eastern has far less need or expectation of expedited decisionmaking, since it may plan and schedule construction activities to avoid unnecessary costs until the permit has been processed and approved. In short, Eastern's attempt at distinguishing *3883 Connecticut* is unavailing.

The foregoing considered, the court will deny plaintiff's motion for summary judgment on Eastern's procedural due process claim.

### III. Defendants' Motion for Summary Judgment as to the Second Amended Complaint (Both Counts)

#### A. Substantive Due Process (Count One)

To succeed on a substantive due process claim, a plaintiff must prove (1) the existence of a legally cognizable property interest and (2) egregious governmental misconduct in depriving the plaintiff of that interest. *See George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 206-09 (D.C. Cir. 2003); *see also* Mem. Op., at 4 (Jan. 23, 2006) [dkt #22].

Assuming the existence of a recognized property interest, *see id.* (holding that plaintiff had alleged such an interest), plaintiff must establish "egregious government misconduct" in the deprivation of that interest. *George Wash. Univ.*, 318 F.3d at 209. The government's infringement of the recognized property interest must constitute a "grave unfairness":

"Inadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress." *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988).

A previous Memorandum Opinion in this case stated:

> Eastern has alleged that the denial of its requested building permit reflected "a deliberate effort" by the defendants "to obtain an unfair advantage in connection with the District's attempt to acquire property through eminent domain" and "to hamper or destroy the ability of [Eastern] to compete against [the District's] own solid waste transfer facilities." First Amended Complaint ¶¶ 5, 40-41. These are allegations of grave and egregious misconduct.

Mem. Op., at 4 (Jan. 23, 2006) [dkt #22]. The question now is whether, after discovery, these allegations along with the supporting, discovered evidence are sufficient to avoid summary judgment. I conclude discovery has not produced evidence upon which a reasonable jury could find the District guilty of egregious governmental misconduct.

First, there is no evidence in the record that the District delayed Eastern's permit application "to artificially depress the value of [Eastern's] property so as to gain an unfair advantage in connection with the District's" plans to take the property by eminent domain for the new baseball stadium. First Am. Compl. ¶ 47. Eastern implicitly acknowledges this; its Second Amended Complaint makes no such allegation. Although the Second Amended Complaint links the delay with the fact that Eastern's property was in an area "which was a finalist for the location of the new stadium," Second Am. Compl. ¶ 51, it no longer mentions a conspiratorial effort to depress the property's value by delaying the permit application. *See also* Pl.'s Opp'n to Defs.' Mot. for Summ. J., at 32 (implicitly acknowledging it is abandoning the depressed valuation theory of its case, but arguing that that theory was reasonable prior to discovery).

So we are left with Eastern's second alleged egregious governmental misconduct: that "[a]llowing Eastern to improve its transfer station was contrary to the District's desire to shut down private stations, shifting . . . commercially-generated waste to District-owned stations." *See id.* at 29-35 (capitalizations omitted); *see also* Mem. Op., at 4 (Jan. 23, 2006) [dkt #22] (a deliberate effort to hamper Eastern from competing with the District in the solid waste business would constitute grave and egregious misconduct for purposes of substantive due process).

However, the record does not establish even a "scintilla of evidence" from which a reasonable jury could find that the District was motivated by such a desire. *See Anderson*, 477 U.S. at 252. At oral argument, Eastern highlighted three primary facts in support of its contention that the District was trying to boost its own solid-waste business by destroying Eastern's:

- Defendants provided Eastern with inconsistent and changing reasons for denying the permit. *E.g.*, DCRA initially requested Eastern provide an EIS because it viewed the proposed improvements as a "substantial modification," *see* Pl.'s Mot. for Summ. J., Ex. 8; it then said the improvements would constitute an "enlargement" of the facility, *see id.* Ex. 25; and finally, on appeal to the BZA, it said that the improvements were "structural alterations" in violation of the zoning regulations, *see id.* Ex. 15, at 395.

- The past (and not amicable) relationship between Eastern and the District concerning the facility. *E.g.*, litigation in the 1990s between the two parties, *see* Pl's Opp'n to Defs.' Mot. to Summ. J., Exs. A-C, F; an email from the deputy mayor's office requesting an updated status on DCRA's dealings with Eastern, *id.* Ex. H.

- The fact that the District in October 2002 began processing its own solid waste after entering into settlement agreements to close two other privately-owned stations. *See id.* Exs. D, E.

Nothing in the record, including the above which plaintiff asserts is its strongest evidence, even remotely establishes a triable issue of fact on whether the District deliberately and nefariously sought to put Eastern out of business in favor of its own solid waste facilities.

To begin, though not dispositive of the matter, *all* of Eastern's evidence is circumstantial. There is no direct evidence or "smoking gun" that the District engaged in egregious misconduct or bore animus toward Eastern. For instance, the past relationship in (totally unrelated) litigation in the 1990s between the District and Eastern, *prior to* the District's initiation of its own solid waste business in 2002, has no relevance to the question whether the District was attempting to shut down Eastern to protect District business. Nothing in the evidence cited by Eastern suggests that the District or any of its staff was concerned about Eastern cutting into the District's solid-waste profit margins.

Perhaps the strongest evidence available to Eastern (and it is not strong) is a memorandum to Noble from a staff member to the director of the District's solid waste business, which argued that the proposed improvements were substantial and required a careful review. *See* Pl.'s Mot. for Summ. J., Ex. 17. However, nothing in the memorandum indicates a concern that allowing Eastern to improve its facility would hurt the District's solid-waste business. In fact, the stated reason for the concern was the staff member's belief that, in the past, Eastern had misrepresented to DCRA a major alteration to its facility as mere "improvements." Meritorious or not, such concern fails to evidence or imply egregious misconduct or animus.

According to Eastern's counsel at oral argument, the "smoking gun" in this case is a September 16, 2004 email from the deputy mayor's office concerning a future meeting between

D.C. officials to discuss, among other things, DCRA's dealings and litigation with Eastern. *See* Pl.'s Opp'n to Defs.' Mot. for Summ. J., Ex. H. The email notes that DCRA's counsel had advised DCRA on its authority to close facilities that violated the law. *Id.* From this plaintiff infers a nefarious plot against its solid-waste business. But the email says absolutely nothing about putting Eastern out of business; nor does it mention anything concerning the District's solid-waste business. Instead, it merely indicates, consistent with defendants' contentions, that DCRA had withheld granting the permit because it viewed the proposed improvements as substantial and potentially damaging the environment. *Id.* The court must give Eastern, the non-moving party, "the benefit of all *reasonable* inferences from the evidence in the record," but "evidence that is merely colorable or not significantly probative cannot create a genuine issue of material fact. The possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment." *Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004) (emphasis added; citations and quotation marks omitted).

Eastern also highlights, again and again, the fact that DCRA told it different and even incorrect information concerning the reasons for its denial. *See, e.g.*, Pl.'s Opp'n to Defs.' Mot. for Summ. J., at 26-29; *see also id.* Ex. 8 (DCRA concerned about the "substantial modification" to facility); *id.* Ex. 25 (DCRA concerned about "enlargement" of the facility); *id.* Ex. 15, at 395 (DCRA concerned about "structural alterations" to the facility). The District, of course, claims DCRA's reasons for the denial never truly changed.

But even assuming DCRA's reasons changed or were mistaken, such inconsistencies, if any, do not create a triable issue of fact because they do not amount to egregious misconduct. *Silverman*, 845 F.2d at 1080. Throughout the decision process—whether the rationale was

labeled substantial modification or enlargement or structural alteration—it is clear that DCRA was concerned about the scope and extent of the improvements. Reviewing these errors and/or inconsistencies, no reasonable juror could conclude an insidious conspiracy by the District to put Eastern out of business. Recall too that the District *knew* in any event that Eastern would be out of business due to the new baseball stadium, which further cuts against the theory that it was concerned about Eastern's ability to challenge the District's solid-waste business.

In sum, despite the voluminous supporting materials filed by plaintiff, the court's searching review of them by way of the summary judgment mechanism has whittled them down to—nothing.

### B.    Procedural Due Process (Count Two)

For the same reasons the court will deny Eastern's motion for summary judgment on the procedural due process count, as explained *supra* Part II, the court will also grant defendants' motion for summary judgment as to procedural due process.

### CONCLUSION

For the foregoing reasons, the court, in an accompanying order, will deny plaintiff's motion for partial summary judgment and grant defendants' motion for summary judgment as to the entire complaint.

/s/

Louis F. Oberdorfer
UNITED STATES DISTRICT JUDGE

DATED:  March 27, 2007